# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 02: 08-cr-365 |
| | ) | |
| JAMILL DENSON, | ) | |
| MATTHEW ROBERT BALZER, | ) | |
| KATIE ANN CHANDLER, | ) | |
| RICHARD EMANUEL COLEMAN, | ) | |
| QUINCY VANCO LEONARD, | ) | |
| BRYAN PATRICK LUCAS, | ) | |
| JASON LAMAR STEVERSON, | ) | |
| ALFRED TERRELL THOMAS, IV, | ) | |
| ROGER LARON UNDERWOOD, and | ) | |
| ROSS EDWARD WEBBER, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF COURT**

Presently before the Court for disposition is Defendant Jamill Denson's MOTION TO SUPPRESS EVIDENCE (Document No. 1236). The government, with the Court's permission, filed an Omnibus Response to all pretrial motions (Document No. 1321), including a specific response to Denson's motion to suppress evidence. The Court conducted an evidentiary hearing on August 18, 2010 regarding the motion, at which testimony was presented from police officers Sean Rattigan and Eric Harpster on behalf of the government. Shelly Everett, a neighbor of Denson, testified on his behalf.

In Denson's motion, he seeks to suppress evidence obtained by police in searches of 806 and 817 Estella Avenue, 628 Calera Avenue, and 703 Taft Avenue, Pittsburgh, Pennsylvania, on September 18, 2008. However, at the evidentiary hearing, counsel for Denson clarified that he is challenging only the search at 817 Estella Avenue (the "Denson House"). In essence, Denson contends that law enforcement agents conducted a warrantless search of his premises at 817

Estella Avenue, based on stale information, during the afternoon hours of September 18, 2008 prior to the issuance of a search warrant by a United States Magistrate Judge at approximately 8:00 p.m. on the evening of September 18, 2008.

The government contends that Denson has not established standing to invoke his right to a reasonable expectation of privacy inside the House.  The government also contends that the agents were permitted and justified to secure the location to prevent the destruction of evidence, and that no information learned during the time the police engaged in securing the premises was included in the affidavit which supported the application for a search warrant presented to the Magistrate Judge, and that the agents searched the Denson House pursuant to a valid search warrant based on probable cause.

FINDINGS OF FACT

    A.    Background of the Investigation

The charges in this case stem from a multi-agency law enforcement investigation of drug trafficking in the Brookline, Beltzhoover and Mount Washington neighborhoods of Pittsburgh, Pennsylvania.  The investigation began in October 2007 with controlled purchases of cocaine from Defendants Leon Hudson and Bruno Desimone.  The government then obtained court-authorized Title III wiretap intercepts on five cellular telephones utilized by Jamill Denson and co-Defendants Nicholas Mihelcic, Anthony Terry and Victor Nelson from May 2008 through September 2008.  On September 17, 2008, agents intercepted phone calls which provided information that a shipment of 10-15 kilograms of cocaine was expected to arrive the next day. Agents arrested Anthony Terry, Jamill Denson and Victor Nelson on September 18, 2008, but

the anticipated shipment of cocaine did not materialize.  That evening, agents executed search warrants and seized extensive evidence, including over $150,000 in cash.  To date, over twenty of the Defendants charged in the Superseding Indictment have pled guilty.

      B.      Government's Attempt to Supplement the Record

The government was apparently surprised when the defense presented a witness, Shelly Everett, to testify at the suppression hearing.  Ms. Everett lived next door to the Denson House on Estella Avenue.  In response to Ms. Everett's testimony, the government called officer Eric Harpster as a rebuttal witness.  During oral argument after both sides rested, the Assistant United States Attorney commented that he might request a renewed hearing.  However, the government did not actually ask to keep the record open or to reopen the hearing.  Instead, the government attached to its post-hearing brief an affidavit signed by four officers who participated in the seizure/search of the House.

The Defendant has objected to the government's attempt to supplement the record in this manner.  The Court agrees with Defendant.  The government, which has the burden of proof to demonstrate the probable cause and reasonableness of the search, rested its case.  It did not seek to hold the record open for the introduction of additional evidence.  Nor did the government request to reopen the proceeding.  The government's current tactic would preclude the Defendant from having an opportunity to cross-examine the "new" witnesses.  Moreover, these witnesses cannot be considered to be "new," as their existence and involvement were well-known to the government at the time of the initial hearing.  Rather, the government made a knowing and informed decision that it did not need to present their testimony at the hearing – a decision it

appears to now regret.

The government's attempt to remedy its decision to not call these officers as witnesses by submitting a post-hearing affidavit is not appropriate and would deprive Defendant of his right to cross-examine these witnesses. The affidavit is hereby STRICKEN and will not be considered by the Court in ruling on the Motion to Suppress.

### C. Denson's Standing

Preliminarily, the government objected that Denson lacks standing to challenge the search of the House. The Court finds that Denson has standing to challenge the search at 817 Estella Avenue as counsel produced a deed reflecting Denson's ownership of the property which was admitted into evidence. In addition, the affidavit of probable cause prepared by FBI Special Agent Todd Prewitt in support of the application for a search warrant averred that the Allegheny County real estate website lists Denson as the owner of the subject property.[1] Although the Court agrees that it is Defendant's initial burden to establish standing, the government should avoid taking a legal position at a suppression hearing that is contrary to the averments in the underlying affidavit of probable cause.

### D. Events of September 18, 2008

As noted above, law enforcement officers had conducted a lengthy investigation of a

---

[1] The affidavit erroneously attached a photograph of Ms. Everett's residence, which is located next door at 819 Estella Avenue. Both houses are located well above street level, and must be approached by climbing a set of concrete steps.

multi-member major drug conspiracy, which alleged involved Defendant Denson. The officers had information that 817 Estella was used as a "stash house" and it became a central situs of the investigation. On September 17, 2008, the agents intercepted telephone calls which led them to believe that a large, multi-kilogram cocaine shipment was to arrive the next day, September 18, 2008. Accordingly, numerous officers were mobilized in an effort to monitor and intercept the transaction while in process.

Officer Rattigan was assigned to conduct surveillance of activities at and around the House and he arrived at his observation vantage location between 8:00 and 9:00 a.m. He remained in constant cell phone contact with other officers in the area throughout the day. During the course of the morning, Rattigan observed activity at and around the Denson House and identified the presence of other alleged members of the conspiracy, including Anthony Terry, Victor Nelson, Daniel Denson, and Daniel Carter. Shortly before 1:00 p.m., Rattigan received a report that Denson and a female had left the Calera Street address in separate cars. The woman was driving a white car with Massachusetts plates. The anticipated drug shipment was expected to come from Massachusetts. Denson was driving a black Cadillac. Shortly thereafter, Rattigan observed both cars park on Estella Avenue. Denson carried a mall-type shopping bag, that appeared to be full of something, from the white car into the House; came back out without the bag; got into the woman's white car and drove off with her, leaving his car parked on the street. Rattigan related these events to the other officers.

The officers became concerned that the cocaine shipment and/or the proceeds were being delivered and/or driven away before their eyes. Accordingly, within minutes they executed a traffic stop and took Denson and the woman (Defendant Katie Chandler) into custody. The

5

officers were also concerned that evidence would be destroyed if the people remaining at the House learned that Denson had been arrested.

Within five to ten minutes after Denson was arrested, numerous law enforcement agents arrived at the scene of 817 Estella Avenue to secure the House. The officers used aggressive tactics, drawn weapons, and profanity to exercise control over all persons within the vicinity of the House. Unfortunately, Shelly Everett, who lived next door, was in the wrong place at the wrong time and was among those detained by the police outside 817 Estella Avenue.

After detaining the persons on the front street steps and porch area, Rattigan and three other officers were instructed to clear the House of any and all persons, for officer safety. It was believed that Daniel Denson was in the House. Officers had not conducted surveillance on the house overnight and were uncertain as to whether anyone else was inside. The door was locked. As the officers were trying to force it open, Daniel Denson came outside. The officers were also required to remove a large bull mastiff dog from the doorway.

Rattigan testified that the officers went through the House with flashlights and weapons drawn to make sure that there were no other people inside. Rattigan testified that there were no searches conducted of any cabinets or furniture, but only of places where people could hide, and that the entire sweep of the inside of the House took approximately five minutes. Rattigan testified that after the security sweep was completed, all officers exited the House and remained either on the front porch or at the back of the House to secure the premises until the search warrant was issued later that evening. The Court finds Officer Rattigan to have been a credible and truthful witness.

Shelly Everett testified that she and her seven children have lived at 819 Estella Avenue,

6

next door to the Denson House, for four years. In the late morning hours of September 18, 2008, Everett walked past the Denson House on her way to her "Store Bus," a snack food business she operated with a partner. Everett had taken soft drink orders from the several persons on the front steps/street area of the Denson House on her way. As she returned and was handing out the soft drinks, she testified that five police cars hurriedly pulled onto Estella Avenue and 15-20 officers jumped out and using guns, profanity and aggressive behavior, herded all persons in the vicinity of 817 Estella Avenue, including Everett, William Denson, Daniel Carter and Anthony Terry into submission at gunpoint. All were handcuffed and told to sit on the sidewalk next to the street. Victor Nelson fled when the officers arrived. Daniel Denson, who was inside the House allegedly getting ice at the time, and Anthony Terry's mother were also handcuffed.

Everett, despite her multiple protests, was forced to sit in handcuffs with the others on the sidewalk below the concrete steps leading to the Denson House for at least an hour. From that vantage point, she could not see the porch or inside the House. Everett testified that she heard rumbling and banging throughout the whole house while the police were in there. Nobody was uncuffed until the dog was secured and the House was cleared. The Court finds some aspects of Ms. Everett's testimony to be credible and believable, particularly the arrest, handcuffing and group detainment on the sidewalk. It is clear that she suffered a traumatic experience on September 18, 2008 at the hands of the police officers, which she recalls with degrees of vividness and vitriol.

Everett stated that after her release, she closely observed the officers for the entirety of the day and evening from her house next door. Everett testified that the officers "ransacked" the Denson House prior to obtaining a search warrant, and did not merely secure it. According to Everett, the officers made numerous trips in and out of the Denson House between 1:00 p.m.

7

through 2:00 a.m. and removed things from the House during the afternoon hours in orange-colored milk crates. These aspects of Ms. Everett's testimony are not easily reconciled with the testimony of the officers and the Court finds that such embellishments are not credible. She could literally have had no knowledge as to whether or when the police had a search warrant or what, if anything, they were doing in the Denson House. Ms. Everett's understandable bitterness at her lengthy detention on September 18, 2008 has impacted her ability to recollect and affected her testimony regarding the events involving the securing and search of the House that day. Indeed, the Court has rarely observed a witness who has displayed such obvious bias and hostility to questioning by an Assistant United States Attorney. Her responses throughout cross-examination were aggressively argumentative, accusingly sharp and reeked with vitriol toward law enforcement personnel. Rarely has the Court observed such a biased witness.[2]

Officer Eric Harpster testified on rebuttal. Harpster participated in securing the premises but had the responsibility to physically take Anthony Terry into custody and was therefore absent from Estella Avenue after 2:00 p.m. on September 18, 2010. Harpster testified that the police do not possess any orange-colored milk crates, but instead used standard light tan moving boxes and evidence bags to remove items from the Denson House that evening after the warrant was issued.

---

[2]Defense counsel recognized that Everett "appeared upset and sometimes appeared curt when answering questions." This is a vast understatement. Ms. Everett's outrage at the way she was treated on September 18, 2008 obviously extends to the entire prosecution of Defendants and has significantly impacted her recollection of the events of that date. It is evident to the Court, if not entirely apparent from the transcript, that Ms. Everett's anger and resentment towards the police officers has prevented her from being able to fairly and objectively testify about the search/securing of the Denson House.

CONCLUSIONS OF LAW

Defendant Denson argues, in essence, that the officers' warrantless entry into the House during the early afternoon hours of September 18, 2008 invalidates the later search pursuant to a warrant. Thus, there are two aspects to the analysis: (1) whether the initial entry into the House was improper; and (2) if so, whether the search pursuant to warrant "cured" the error.

The Court need only address the first issue because it concludes that the initial entry into the House was reasonable. The Fourth Amendment to the United States Constitution prohibits only "unreasonable" searches and seizures. In *Segura v. United States*, 468 U.S. 796 (1984), the United States Supreme Court held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Id.* at 810. *Segura* involved a drug investigation in which the officers entered an apartment and "secured it from within" while a search warrant was obtained. The Supreme Court upheld this action and explained that a warrantless seizure to protect evidence from destruction and/or removal did not offend the Fourth Amendment even if there was no immediate fear that the evidence was in the process of being destroyed or lost. *Id.* at 807. The Supreme Court further explained that "the wiser course" for the officers involved in the *Segura* case "would have been to depart immediately and secure the premises from the outside by a 'stakeout' once the security check revealed that no one other than those taken into custody were in the apartment."

The "wiser course" endorsed by the Supreme Court in *Segura* is precisely what the officers in this case followed. Officers took the people on the steps and porch into custody, then

9

performed a safety sweep of the House to check for other people.  The security sweep lasted only five or so minutes and the officers exited immediately thereafter and set up a "stakeout" until the search warrant was obtained.  Such a protective sweep was entirely justified, incident to the arrest of Anthony Terry, Daniel Carter, William Denson and others, for officer safety and to prevent the potential destruction of evidence by anyone who may have remained in the House. *Maryland v. Buie*, 494 U.S. 325 (1990); *United States v. Foley*, 218 Fed. Appx. 139, 144 (3d Cir. 2007) (non-precedential) (citations omitted).  The protective sweep of the Denson House was limited to areas in which a person could hide and lasted only five minutes or so.  From their year-long investigation, the officers had probable cause to believe that a drug conspiracy was being carried on in and around the Denson House and that evidence of that conspiracy would most probably be found therein.  In summary, the officers' initial entry into the House to conduct a protective sweep, and their subsequent seizure and "stakeout" of the outside of the Denson House while waiting for a search warrant to be obtained was reasonable and did not violate Denson's Fourth Amendment rights.

Even assuming, arguendo, that the initial entry was improper, the Court would decline to suppress the evidence obtained pursuant to the search warrant under the "independent source/inevitable discovery" doctrine.  The Supreme Court has held that where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received."   *See Nix v. Williams*, 467 U.S. 431, 444 (1984).  The government can meet its burden by showing "that the police, following routine procedures, would inevitably have uncovered the evidence." *United States v.*

*Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir.1998). Under the facts and circumstances of this case, the police would have inevitably obtained the items from inside 817 Estella Avenue by lawful means. The affidavit in support of the application for a search warrant was not derived from and did not refer to any information obtained during the security sweep entry into the House. *Segura*, 468 U.S. at 814. To the contrary, the affidavit recounted the substantial information obtained during the year-long wire-tap investigation of the alleged drug conspiracy. The affidavit also recited the custodial statements of Anthony Terry on September 18, 2008 that the conspirators were in the process of receiving a multi-kilogram shipment of cocaine and that "a large quantity of money currently is located inside 817 Estella Avenue." United States Magistrate Judge Lenihan had probable cause to issue the search warrant and the officers reasonably relied upon that warrant in conducting the search of 817 Estella Avenue during the evening hours of September 18, 2008. Accordingly, Defendant's motion to suppress evidence will be DENIED.

     An appropriate Order follows.

                              McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | 02: 08-cr-365 |
| | ) | |
| JAMILL DENSON, | ) | |
| MATTHEW ROBERT BALZER, | ) | |
| KATIE ANN CHANDLER, | ) | |
| RICHARD EMANUEL COLEMAN, | ) | |
| QUINCY VANCO LEONARD, | ) | |
| BRYAN PATRICK LUCAS, | ) | |
| JASON LAMAR STEVERSON, | ) | |
| ALFRED TERRELL THOMAS, IV, | ) | |
| ROGER LARON UNDERWOOD, and | ) | |
| ROSS EDWARD WEBBER, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER OF COURT

AND NOW this 7th day of October, 2010, in accordance with the foregoing Memorandum Findings of Fact and Conclusions of Law, it is hereby ORDERED, ADJUDGED and DECREED that Defendant Jamill Denson's MOTION TO SUPPRESS EVIDENCE (Document No. 1236) is **DENIED**.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Craig Haller, AUSA
Thomas W. Brown, Esq.